John K. RAINS, Plaintiff,

v.

CASCADE INDUSTRIES, INC.,
Defendant.

Civ. A. No. 976–66.

United States District Court
D. New Jersey.

June 15, 1967.

Winne & Banta, Hackensack, N. J., for plaintiff, by Joel Martin Aurnou, White Plains, N. Y. (New York Bar), Joseph A. Rizzi, Hackensack, N. J., of counsel.

Sperry & Zoda, Trenton, N. J., for defendant, by Frederick A. Zoda, Trenton, N. J.

### Defendant's Motion For Summary Judgment

### OPINION

WORTENDYKE, District Judge.

The action is for appropriate statutory relief for alleged infringement of plaintiff's design patent, United States No. Des. 201,793, issued August 3, 1965, upon application filed April 26, 1963, for a swimming pool as disclosed in the twelve figures set forth in the patent, which claims "the ornamental design for a swimming pool, as shown and described." Defendant has counterclaimed for a declaratory judgment of invalidity and/or non-infringement, and seeks injunctive relief from plaintiff's charges of infringement. Defendant has moved for summary judgment upon its counterclaim and, in addition to the figures contained in the patent in suit, annexes to its brief in support of the motion various documentary exhibits which defendant contends disclose all of the relevant prior art.

The device illustrated by the drawings of the patent in suit is described by the defendant, without contradiction by the plaintiff, as "an 'on-ground' pool, having a rectangular swim tank which rests upon the ground. An elevated deck extends about the tank and is bounded by a railing. Stairs extend from the ground to the deck." Plaintiff concedes that the designed devices are correctly called "above ground pools, since they are always above ground but do not necessarily rest on the ground * * * [but] may rest on blocks * * * or partially in the ground when they are constructed with diving bowls." Plaintiff also concedes that the motion for summary judgment is appropriate in this case because "the Court has before it all of the necessary prior art to determine validity." Such was the situation in Alco Kar Kurb, Inc. v. Ager, 286 F.2d 931 (3 Cir. 1961).

The action was instituted initially in the United States District Court for the Southern District of New York on March 22, 1966, (66 Civ 812) by the patentee against the present defendant and another alleged infringer, Jil-Mic, Inc. By his Order of August 26, 1966, 258 F. Supp. 974, Judge Wyatt of that Court severed the action as to defendant Cascade Industries, Inc., for improper venue, and transferred it to this District. The record so compiled was filed with the Clerk of this Court on September 29, 1966, where Cascade's answer and counterclaim were filed in due course.

In opposition to defendant's present motion, plaintiff has filed an affidavit, sworn to March 27, 1967, in which he sets forth the history of his patented design. Annexed to the affidavit is a copy of an Opinion of Judge Sugarman, of the United States District Court for the Southern District of New York, dated June 1, 1966 in the case of the present plaintiff (Rains) against Monarch Pool Corp. et als. (65 Civ 2531), in which cross motions of defendants and plaintiff for summary judgment upon the issues of validity and infringement of the patent there and here in suit were denied. Judge Sugarman's views respecting the design patent before him appear from the following excerpt from his Opinion:

"The differences between the plaintiff's design and the prior art are not primarily functional and structural.

The plaintiff's design of an inclined strut and a separate vertical fence post presents an entirely different configuration from that of the prior art. It is obviously more pleasing to the eye and it is obviously copied by the defendants' pool.

The gusset plates between each inclined strut and each stud are predominantly decorative. If the only purpose were to have a reinforcement to prevent the bowing of the studs and the panels forming the well of the pool, this could have been simply accomplished by placing one or two cross members bolted to each stud and companion strut. The employment of the gusset not only results in a pleasing design but allows for the use of narrow plywood which is far more attractive than would the cross members which could serve equally well the utilitarian purpose. Here again the defendants' pool imitates precisely the plaintiff's design.

It does not persuasively appear on the record before me on this motion that the criss-cross splats employed in the plaintiff's fence structure are in any wise stronger than the horizontal splats employed in the prior art and the defendants' fence structure. Admittedly the defendants' pool does not copy the criss-cross splat configuration of the fence. However, this is so small a detail as to not warrant the granting of summary judgment partially on this very small insignificant difference."

Accordingly, Judge Sugarman denied plaintiff's, as well as defendants', motion for summary judgment.

■ The granting of a design patent must be based upon invention of a new, original and ornamental design nonobvious to a person of ordinary skill in the art. R. M. Palmer Company v. Luden's Inc., 236 F.2d 496 (3 Cir. 1956).

Cited by the Patent Office to the patent in suit are the following references: United States Patent Des. 185,570, 6/59, to Pruess; Des. 189,811, 2/61 to Pruess; 2,490,272, 12/49, to Kascle; 3,016,546, 1/62, to Lerner; French Patent No. 768,506, 5/34, and British Patent No. 876,480, 9/61. An additional reference cited is "Popular Mechanics April 1961, page 162, rail fence at top second down from left." The patent in suit contains no descriptive specifications other than the drawings, and the single claim consists simply of a reference to the drawings. The distinguishing features of the pool designed consist of a rectangular water-containing tank with vertical walls around the perimeter of which at the level of the top of the walls extends a continuous horizontal platform exteriorly bounded by a fence, and accessible from the ground level by a flight of steps. The fence and the platform which it surrounds are supported from below by brackets or struts resting upon the exterior edge of the floor of the tank, and between each inclined member and the exterior wall of the tank, there are pairs of gussets, in parallel planes, partially enclosing that triangular space.

PRIOR ART

French Patent No. 768,506 issued in May 1934 to Basseux and Fayard, discloses a rectangular swim tank resting upon the ground, an elevated horizontal deck or walkway that projects laterally

and outwardly from and extends along one or more sides of the tank, approximately level with its top edge. The deck is supported by inclined struts extending between the exterior of the bottom portion of the tank and the outside edge of the deck at selected intervals along the length of the tank. A flight of steps leads from the ground, exteriorly to the tank, to the deck, and a railing extends along the outside edge of the deck and projects upwardly therefrom. United States Patent 2,490,272, issued in 1949 to Kascle, and British Patent No. 876,480 issued in 1961, disclose swimming pool designs similar to that of the French Patent with the exception that vertical posts are substituted for the inclined struts as supports for the deck which surrounds the tops of the sides of the tank. The specifications of the Kascle patent describe his invention as relating to "a swimming pool construction of a portable nature since it is easily assembled and dismantled for removal from one location to another with the minimum of effort and time." Kascle describes his pool as "a swimming pool of sections having watertight, interlocking parts which may be quickly dismantled and assembled." It is a construction, rather than a design patent. British Patent No. 876,480 is a rectangular, on-ground swimming pool with a deck or platform along and extending outwardly from the sidewalls of the tank and bounded along the outer edge of the deck by a fence. Access to the platform is by a flight of steps from the ground level exterior to the walls of the tank, and the deck and fence are supported along their outer edges by vertical posts resting upon the ground level.

United States Patent Des. 185,570, issued June 23, 1959 to Pruess, on application Filed December 19, 1958, discloses a combination on-ground and below ground swimming pool consisting of a rectangular tank of non-uniform depth, the bottom of which rests partly upon the ground, but in part below the level of the ground, so as to provide a deeper portion at one end of the tank for diving purposes. The device also provides a deck extending around the upper edges of the walls of the tank, and outwardly therefrom, accessible exteriorly by a flight of steps and, supported together with a fence along the outer edge of the deck, by means of vertical supports resting upon the ground level exterior to the bottom of the tank. In United States Patent Des. 189,811, also issued to Pruess in February 1961, the foregoing features of his prior patent are modified by the employment of an outwardly inclined, rather than a vertical, railing about the deck extending outwardly and upwardly from the outer edge of the deck.

United States Patent 3,016,546, issued January 16, 1962 to J. Lerner, upon application filed January 27, 1959, is entitled "Method of Manufacturing Swimming Pool and the Article." It is not a design patent but claims a "method of manufacturing a swimming pool comprising the steps of prefabricating a plurality of individual wall sections."

On Page 162 of the well-known magazine Popular Mechanics, for the month of April 1961, there were illustrated various examples of rail, rustic and shadowbox fencing. The criss-cross splats shown in the drawing contained in the magazine are clearly disclosed in the fence around the deck in Fig. 1 of the patent in suit. That feature of Rains' design is clearly not invention.

In addition to the prior art referenced in the patent in suit, the defendant contends that the method employed for the support for the deck and fence is old in the allegedly analogous prior art relating to brackets. Accordingly defendant cites United States Patent 1,016,908, issued February 6, 1912 to A. A. Warner, upon application filed June 9, 1911, for a bracket consisting of "a base and a bracket arm, three or more points of attachment of said arm to said base, said points of attachment being in alinement when seen from the front of said base, one of said points of attachment

being out of alinement with at least two of the others when seen from the edge of the base." There is also cited United States Patent No. 1,391,983, issued September 27, 1921, on application filed November 10, 1915, to K. R. Schuster, for a scaffold-bracket for "the centering, now used extensively as the means for supporting the forms or molds required in the erection of floors, etc." The bracket consists of "a body member provided with a shelf and a slot positioned above said shelf, and a wall-engaging member separate from said body member, said wall-engaging member being driven through the slot and a substantial part of said wall-engaging member being exposed above the shelf so as to be available in supporting a part of the load of the scaffold." Defendant also cites United States Patent 1,633,279 issued March 20, 1928, upon application filed May 7, 1926, to B. A. Portt for a window scaffold which the inventor describes as "a bracket having a spring tensioned section which section is adapted to be compressed by the projecting portion of the sill to permit of the face of the bracket resting firmly against the face of the wall * * * [and] a scaffold which is convenient to use and which is economical to manufacture and assemble." None of these bracket patents anticipates the design patent here in suit nor renders that design obvious. They belong to a non-analogous art.

In his affidavit in support of his motion for summary judgment the present plaintiff discloses that he is a graduate engineer with many years of experience in the field of above-ground, wooden swimming pools, having been employed by Modern Swimming Pool Company and International Swimming Pool Corporation, and, since 1962, having been President of the Apex Pool Equipment Corporation, which is the exclusive manufacturer and wholesaler of pools of his patented design. He is also President of Family Pools, Inc. which sells and installs his patented pools at retail in Westchester County, New York, and neighboring areas. Apex Pool Equipment Corporation wholesales these pools on a territorially exclusive distributorship basis, and has enjoyed great commercial success marketing only the pool of the patented design. Plaintiff further states that a substantial dealership network has been established by Apex, with longterm franchised distributors who, in turn, market the pool to the public through their dealers. Early in 1963 Apex signed a distributor franchise agreement with a corporation controlled by one Jerry Blumenthal, who thereupon commenced to market pools of the plaintiff's design. While plaintiff's patent application was pending, Blumenthal's distributorship was terminated but he nevertheless continued to market a pool which was identical with the plaintiff's design, except for the use of the straight rails in the fencing around the deck. Plaintiff charges that Blumenthal also copied the gussets used in the Rains design, and employed photographs of the plaintiff's pool in his (Blumenthal's) marketing operation with the fencing depicted in the patent. After the commencement of litigation in a New York Court by the present plaintiff against Blumenthal, the latter modified his pool design slightly by changing the configuration of the gussets to the shape presently utilized by the defendant, Cascade. The patent in suit issued in August 1965, and in the following month Blumenthal became Sales Manager of above-ground pools for Cascade. Defendant had for some time been a supplier of liners and other equipment for pools designed by the plaintiff, but prior to the commencement of Blumenthal's employment by Cascade the latter had never manufactured an above-ground pool.

There have been submitted to this Court, three scale models of above-ground pools. One of these models is of the "Futura" pool currently marketed by International Swimming Pool Corporation which holds a patent thereon and is an active competitor of plaintiff. Another scale model is an accurate reproduction of plaintiff's patented design.

The third scale model is of the pool of the defendant. It is the plaintiff's contention that nowhere in the prior art is disclosed a single pool of a design approximating that of the plaintiff in appearance. Plaintiff states that "Not only are the gusset, fencing, sundeck, silhouette and overall appearance completely different and new, but in addition the arrangement thereof is also different from any of the prior art. It is the feature of overall appearance which is responsible for its commercial success."

Plaintiff further states that his pool design has been copied by Monarch Pool Corp., a former distributor, which the plaintiff sued in the Southern District of New York, and by Niqua, Inc., formed by a group of individuals whom the plaintiff charges with having stolen his design. He also alleges that one of his former employees went into business for himself under the corporate name of Amphi-Pool Corp. which manufactured pools with matched pairs of gussets of the same design as that used by Cascade except "that the tiny open space at the bottom of the gussets is not enclosed on the Amphi-Pool design."

 Because both of the parties to this case have requested the Court to decide the issue of validity of the patent in suit upon their respective cross motions, we turn immediately to the statute under which the patent was issued. 35 U.S.C. § 171 provides as follows:

"§ 171. Patents for designs

Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title.

The provisions of this title relating to patents for inventions shall apply to patents for designs, except as otherwise provided."

In adopting § 171 Congress intended to encourage ornamentation and beautification in manufactured articles so as to increase their saleability and satisfy the aesthetic sense of the purchaser, R. M. Palmer Company v. Luden's Inc., 128 F.Supp. 672 (E.D.Pa.1955), affirmed in part 236 F.2d 496 (3 Cir. 1956); but a design patent requires invention, newness, originality and ornamental qualities. Sel-O-Rak Corp. v. Henry Hanger & Display Fixture Corp. of America, 232 F.2d 176 (5 Cir. 1956) cert. den. 352 U.S. 870, 77 S.Ct. 95, 1 L.Ed.2d 76 (1956). Although the grant of a design patent is intended to give encouragement to the decorative arts, and therefore such patents do not contemplate so much utility as appearance, it is immaterial that the subject of the design may embody functional or utilitarian purpose. Robert W. Brown & Co. v. De Bell, 243 F.2d 200 (9 Cir. 1957). It is the design as a whole, and not the deceptive individual elements thereof which provides the frame of reference for the determination of the validity and infringement of a design patent. Philco Corp. v. Admiral Corp., 199 F.Supp. 797 (D.Del.1961).

In Palmer v. Luden's, supra, the majority opinion states (236 F.2d at 500) that:

"The specifications for the granting of a design patent, as set forth in the Act are invention of *a new, original and ornamental design non-obvious to a person of ordinary skill in the art.* In Gorham [Mfg. Co.] v. White, 1872 14 Wall. 511, 525, 20 L.Ed. 731, an infringement case, the Supreme Court emphasized that

'it is the appearance itself * * * that constitutes mainly, if not entirely, the contribution to the public which the law deems worthy of recompense. The appearance may be the result of peculiarity of configuration or of ornament alone, or of both co-jointly, but in whatever way it is produced, it is the new thing or product which the patent law regards.'" (Emphasis supplied)

The majority opinion in *Palmer* also cited Glen Raven Knitting Mills v. Sanson Hosiery Mills, 189 F.2d 845 (4 Cir. 1951), and several other cases as authority for the statement that "the test is whether the design involved 'a step beyond the prior art requiring what is

termed "inventive genius" '." Reference was also made to the emphasis in *Glen Raven* of "the special importance of commercial success in determining the validity of the design patent."

■ If the design disclosed by the patent in suit is to be held patentable, it must be a "new, original and ornamental design non-obvious to a person of ordinary skill in the art." The determination of whether the design is ornamental must depend upon the reaction thereto of the eye of the beholder. Whether the design is new and original is determinable by its comparison with the prior art. However a design patent may not be obtained even though it is not identically disclosed or described in the prior art if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. § 103; Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

■ The fact that the patent in suit was granted creates a rebuttable presumption of its validity. Bliss v. Gotham Industries, Inc., 316 F.2d 848 (9 Cir. 1963). The evidence of the commercial success of the patented design also enhances the presumption of the patent's validity. Sanson Hosiery Mills, Inc. v. Warren Knitting Mills, Inc., 202 F.2d 395 (3 Cir. 1953).

The cases stating the criteria of validity and infringement in the field of design patents are numerous and consistent. In General Time Instruments Corp. v. United States Time Corp., 165 F.2d 853 (2 Cir. 1948), which involved a design patent for a clock casing, it was held that a design patent must be the product of invention if it is to be valid; that it will not suffice merely to show that the design is novel, ornamental or pleasing in appearance. It must reveal a greater skill than that exercised by the ordinary designer who is chargeable with knowledge of the prior

art. In short, the test is whether the design involved a step beyond the prior art requiring what it termed "inventive genius". In different language, Patriarca Mfg., Inc. v. Sosnick, 278 F.2d 389, 391 (9 Cir. 1960), held that "[t]o be patentable, the design, viewed as a whole, must produce a new impression upon the eye. Where invention is plainly lacking, commercial success cannot fill the void." The same Court, in 1963, in Bliss v. Gotham Industries, Inc., 316 F.2d 848 (9 Cir. 1963), commencing at page 850, quoted from Blisscraft of Hollywood v. United Plastics Company, 294 F.2d 694 (2 Cir. 1961), in holding invalid a design patent for a polyethylene pitcher, a subject which was also involved in *Blisscraft*. In the latter case the Second Circuit Court of Appeals had stated:

"To be patentable, a design, in addition to being new and inventive, must be ornamental. This means that it must be the product of aesthetic skill and artistic conception." Citing Burgess Vibrocrafters, Inc. v. Atkins Industries, Inc., 204 F.2d 311 (7 Cir. 1953).

In different language, the 7th Circuit in Amerock Corporation v. Aubrey Hardward Manufacturing, Inc., 275 F.2d 346, 347 (1960), held invalid a design patent for "a plain 'streamlined' curved hardware [drawer] pull with tapered handle ends on a pair of legs which gradually widen as they merge into the handle." At page 348 of its Opinion, that Court stated:

"The fact that the design may be 'new and pleasing enough to catch the trade' alone is not sufficient. * * * Likewise, 'neither is it sufficient simply to show that no prior design is "like" the one in suit.' * * *

To fulfill the requirement for the exercise of the inventive faculty in design patents, we must find creative originality in artistry. Designs consist of combinations and are to be tested for their 'over-all esthetic effect.' "

The same opinion cited Battery Patents Corporation v. Chicago Cycle Supply Co., 111 F.2d 861, 863 (7 Cir. 1940), which

held invalid a design for a bicycle lamp and mud guard in combination because the patentee "did only that which a skilled designer, working with the tools and materials at his command, would do."

The design of the patent in suit utilizes in combination a number of elements which severally were well known to the prior art. The utilization of these old elements in combination does not represent inventive skill and creative talent beyond that of the ordinary designer chargeable with knowledge of the prior art. What the plaintiff here has done amounts to nothing more than "an unstartling regrouping of old elements which demonstrated no originality born of inventive faculty." (*Bliss*, supra, 316 F.2d at p. 850). If it be assumed that plaintiff's design discloses the talent of an adapter, nevertheless it fails to manifest the art of the inventor. Moreover, the design is not ornamental in the sense that it is the product of aesthetic skill and artistic conception. It has no particularly aesthetic appeal, in line, form, color, or otherwise. It contains no dominant artistic motif either in detail or in its overall conception. The design involved in Blumcraft of Pittsburgh v. United States, 372 F.2d 1014 (Ct.Cl.1967) is distinguishable from that in the case at bar. In *Blumcraft, supra* at page 1016, the Court stated that the patented rail design "creates an illusion of a plurality of hand rails floating in space away from the supporting posts. The aesthetic effect is pleasing." Again, at page 1017 of *Blumcraft*, the Court stated that the "originality is shown in the design taught by the plaintiff's design patent." See Zangerle & Peterson Co. v. Venice Furniture Novelty Mfg. Co., 133 F.2d 266, 269 (7 Cir. 1943).

Where there is doubt as to the patentability of an inventor's design, such doubt should be resolved in favor of the validity of the patent. To the presumption of validity provided by 35 U.S.C. § 282 "there is the additional presumption arising from the fact that the invention filled a want arising from a new situation, that it entered into immediate use and that it met with pronounced commercial success." Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corporation, 40 F.2d 910 (4 Cir. 1930) citing Temco Electric Motor Co. v. Apco Mfg. Co., 275 U.S. 319, 48 S.Ct. 170, 72 L.Ed. 298 (1928); Diamond Rubber Co. v. Consol. Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527 (1911); Pangborn Corporation v. W. W. Sly Mfg. Co., 284 F. 217 (4 Cir. 1922). There is the added presumption arising from the imitation of the patented article by the manufacturer of the alleged infringing device. Kurtz v. Belle Hat Lining Co., Inc., 280 F. 277, 281 (2 Cir. 1922), held that "[t]he imitation of a thing patented by a defendant, who denies invention, has often been regarded, * * * as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think." That statement was quoted, and the decision from which it was taken was followed in Ackermans v. General Motors Corp., 202 F.2d 642 (4 Cir. 1953). The evidence before me discloses that the designer of the accused pool formerly sold pools of the patented design as a distributor for Apex Pool Equipment Corporation, plaintiff's corporation. Among his sales was that of a pool of the patented design, but with horizontal fence rails in place of the crisscross fencing, to a customer in the New York Metropolitan area whom he also furnished with an Apex liner guarantee to be filed with plaintiff's corporation.

Despite the various presumptions created by the statute and recognized in the foregoing decisions, which tend to support the validity of a duly issued patent, the more recent pronouncements of the courts enunciating the criteria for design patents impels me to the conclusion that the Rains design patent United States No. Des. 201,793 is invalid. Those presumptions are insufficient to overcome the clear lack of the criteria stated in 35 U.S.C. § 171 as judicially construed. In *Amerock*, supra,

275 F.2d at p. 348 (the drawer pull case) the Opinion stated that "[a] design patent, in order to be valid, must disclose a design that is new, original and ornamental, unanticipated and inventive in character, and beyond the skill of the ordinary designer or draftsman." The same Court held that "[t]he law applicable to design patents does not differ from that governing mechanical patents in that in either case there must be originality and the exercise of the inventive faculty." The design in *Amerock* was pleasing to the eye, was attractive enough to catch the trade and met with substantial commercial success but, as the Seventh Circuit Court of Appeals stated, at page 348, "although commercial success in exploiting a patent may be used to resolve a doubt in favor of a patentee, it cannot be used to create a doubt; otherwise, every useful and successful thing would be patentable. * * * Where invention is plainly lacking, 'commercial success cannot fill the void.'" *Amerock* was cited with approval by the same Court in Day-Brite Lighting, Inc. v. Sandee Manufacturing Co., 286 F.2d 596, 599 (7 Cir. 1960) cert. den. 366 U.S. 963, 81 S.Ct. 1925, 6 L.Ed. 2d 1255 (1961). As stated in *Blisscraft,* supra, a design to be patentable must be (1) new, (2) inventive, (3) ornamental and (4) the product of aesthetic skill and artistic conception. We add a further requirement, namely, that the design be non-obvious. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); 35 U.S.C. § 103. Assuming that the Rains design was new and that Rains was its inventor, it is not ornamental in the sense of being the "product of aesthetic skill and artistic conception." It has no particular aesthetic appeal in line, form, color or otherwise. Its use of the twin plywood gusset plates to cover the area between the deck-supporting struts and studs does not constitute a "dominant artistic motif either in detail or in its overall conception." Moreover, the design as a whole would be obvious to a carpenter of ordinary skill familiar with the prior art. 35 U.S.C. § 103; Graham v. John Deere Co., supra.

 Having arrived at the conclusion that the patent in suit is invalid, the issue of infringement is not reached. However, if my conclusion of invalidity is in error, the issue of infringement must be decided against the defendant.

An Order may be presented for summary judgment in favor of the defendant for failure of the evidence to support the claimed validity of the patent in suit.